## CHICK v. FARR.

1. When the same person unites in himself the character of both debtor and creditor, the debt is to be regarded as paid by operation of law. But where R and P are sureties on the administration bond of C, and C died, and R, one of these sureties, became administrator *de bonis non*, who afterwards also died, before any account had been taken of C's administration, or any indebtedness by C, as administrator, had been ascertained, the amount due by C (and his sureties) was not so paid to R, when he administered, as to relieve P, the co-surety, from liability for C's *devastavit*, afterwards established. The doctrine fully discussed, and the cases reviewed.

2. P having also signed as surety the bond of R, as administrator *de bonis non*, if the balance now ascertained to have been in C's hands at his death, could be regarded as paid to R, when he administered, it would be cash in R's hands as administrator, for which P, as surety on R's bond, would be liable.

3. Where C received from intestate in his life-time certain notes for collection, and afterwards administered on his estate, and payment on these notes was properly accepted in Confederate money, but it does not appear at what time they were paid, the administrator was chargeable with the value of Confederate money at the date of the maturity of the notes, which was prior to the death of intestate. For C's own note to intestate maturing after intestate's death, C was chargeable with the value of such money at the maturity of his note.

4. An administrator is liable for interest on the balances in his hands, but not for interest on the aggregate of principal and interest agreed by counsel to have been in his hands at a past date.

5. Petition for rehearing refused.

Before Norton, J., Newberry, November, 1887.

The opinion fully states the case.

*Messrs. J. F. J. Caldwell* and *G. G. Sale,* for appellant.

*Messrs. Moorman & Simkins,* contra.

November 1, 1889. The opinion of the court was delivered by

MR. JUSTICE MCIVER. Under this proceeding to marshal the assets of the estate of Pettus W. Chick, his creditors were called in to establish their claims. Amongst the claims presented were certain notes under seal, made by J. S. Chaplin to the executors of Thos. H. Henderson, upon which said executors had recovered judgment against Geo. M. Chaplin, as administrator of J. S. Chaplin, for which it is claimed that Pettus W. Chick was liable, as well as surety on the administration bond of G. M. Chaplin, as also as surety on the bond of R. S. Chick, as administrator *de bonis non* of J. S. Chaplin ; and the question is as to the liability of plaintiff's testator on these claims.

It appears that J. S. Chaplin died intestate in November, 1862, being indebted on the note above referred to, and that G. M. Chaplin, soon after his death, administered on his personal estate, entering into a bond with Pettus W. Chick and R. S. Chick as his sureties. G. M. Chaplin died on the 9th of June, 1866, without having fully admistered the estate of his intestate, and on the 15th of August, 1866, letters of administration *de bonis non* on the estate of J. S. Chaplin were duly granted to R. S. Chick, who entered into bond with Pettus W. Chick as his surety. R. S. Chick having died in 1876, before fully administering the estate of said J. S. Chaplin, administration *de bonis non* of said estate was finally committed to the appellant, Jno. M. Kinard, as clerk of the Court of Common Pleas for Newberry County.

In order to ascertain the liability of Pettus W. Chick as surety on the administration bond of G. M. Chaplin, it was necessary to have an accounting of that administration, and so also, in order to fix the liability of Pettus W. Chick as surety on the bond of R. S. Chick, it was necessary that an account should be taken of his administration. To facilitate these purposes, it was agreed

by counsel to adopt the accounts as stated by master Douthit, under certain proceedings instituted in Greenville County, for the purpose, as we suppose, of settling the estate of R. S. Chick. Under that proceeding the liability of R. S. Chick, as surety on the bond of G. M. Chaplin, was reported to be, with interest to 1st October, 1883, something over twelve thousand dollars (this amount not appearing in the master's report in this case, was added by consent at the hearing), and R. S. Chick's liability as administrator *de bonis non* of J. S. Chaplin was reported, with interest to same date, to be $692.03. This agreement was, however, accompanied with the proviso "that there be allowed in the former of these accounts such discounts as may be proper for transactions with reference to Confederate States currency."

Amongst the assets which went into the hands of G. M. Chaplin, as administrator of J. S. Chaplin, were his own note to his intestate for $360, due 1st January, 1863, but when made does not appear; and also a lot of notes, amounting in the aggregate to $1,918.45, the dates of which are not given, which are entered in the inventory, in the handwriting of G. M. Chaplin, as notes received by him from his intestate for collection, and stated to be due 1st of January, 1862. What became of these notes does not appear, but none of them are now to be found, and they are not entered as collected in any of the returns made by G. M. Chaplin as administrator, the last of which was made by him on the 4th of September, 1864, though there is another return made for him by Baldwin Little, as late as the 29th of September, 1865.

Upon this state of facts the master held, amongst other things, that any liability which Pettus W. Chick may have incurred as surety on the bond of G. M. Chaplin, was not discharged by operation of law, when his co-surety, R. S. Chick, became administrator *de bonis non*, under the principle that when the same person becomes both debtor and creditor, the debt is to be regarded as paid by operation of law; and he therefore rendered judgment against the estate of Pettus W. Chick for the balance found due on the account taken of G. M. Chaplin's administration, after scaling all of his receipts and disbursements, including therein the amount of the sale bill, and refusing to scale the lot of notes received by G. M. Chaplin from his intestate for collec-

31—31

tion, as well as his own note, and also for the amount found due on the account taken by master Douthit of the administration *de bonis non* by R. S. Chick of the estate of J. S. Chaplin.

Master Douthit having made up his accounts of both these administrations to the 1st of October, 1883, with interest to that date, the master in this case allows interest on the sums then ascertained to be due from that date. To this report the plaintiff and some of the simple contract creditors filed exceptions, and the case was heard by his honor, Judge Norton, upon the report and exceptions. He rendered judgment, overruling the master in holding that whatever balance may have been found due on the account taken of G. M. Chaplin's administration, could not be regarded as paid by operation of law, when R. S. Chick, who was also liable for such balance, became administrator *de bonis non*, and holding, on the contrary, that the estate of Pettus W. Chick was thereby discharged from any liability for such balance. He also overruled the master in holding that the note of G. M. Chaplin to his intestate, as well as the lot of notes set down in the inventory as received by him from his intestate for collection, should not be scaled, finding as matter of fact that these notes had been collected in Confederate States notes, and as they all matured on or before the 1st of January, 1863, he held that they should be scaled as of that date. He furthermore held that the master was in error in his mode of stating the account as to the matter of interest, and that the bond of G. M. Chaplin, if liable at all, could only be held liable for interest on balances as they became due, and not for interest upon the aggregate sum of principal and interest found due by Master Douthit on the 1st October, 1883.

From this judgment, due notice of appeal was given by the appellants herein upon the several grounds set out in the record, which raise substantially but four questions, viz.: 1st. Whether there was error in holding that the sureties of G. M. Chaplin were discharged by operation of law from liability for any balance that may have been found on taking an account of his administration when one of those sureties became administrator *de bonis non* of the intestate. 2nd. If not, whether there was error in not holding that the surety on R. S. Chick's bond as

administrator *de bonis non* was liable for such balance. 3rd. Whether there was error in holding that the notes referred to, or rather the amounts due thereon, should be scaled under the act in relation to the value of Confederate States treasury notes. 4th. Whether there was error in the mode of charging interest adopted by the master.

As to the first question, while there is no doubt that the general rule is that, where the same person unites in himself the character of both debtor and creditor, the debt is to be regarded as paid by operation of law, yet, as will be seen by a review of the cases, its application to a given case is attended with no little difficulty.

In *Simkins* v. *Cobb* (2 Bail., 60), the action was upon an administration bond. It appeared that the administrator had been duly appointed guardian of the two distributees of his intestate's estate, and had charged himself, in his guardianship accounts, with the balance in his hands as administrator. It was held that the administration bond was thereby discharged, upon the principle that the balance ascertained by a decree of the ordinary to be in his hands as administrator, was payable to himself as guardian, and, under the rule above stated, was to be regarded as paid by operation of law, although such decree was rendered after one of the distributees had attained his majority, and, therefore, then entitled to receive his own share, because the balance found due by the decree was the balance appearing on the administrator's last return which was made during the minority of such distributee, and was then payable to the guardian : the court saying : "The decree, therefore, is evidence that on that day [the date of the last return], he was indebted to his distributees" in the sum then appearing to be due, which, with interest thereon from the date of the last return to the date of the decree, constituted the amount of the decree.

In *Trimmier* v. *Trail* (2 Bail., 480), decided at the next term of the court, the action was against a surety on an administration bond, who pleaded in bar that he had been discharged by the ordinary and one Williams substituted in his place, on 16th of August, 1816. The plaintiff replied that on 24th January, 1815, before the discharge, the administrator had bid off property at the

sale made by him and retained in his possession goods, &c., to the amount of $1,753, which constituted the sum for which the ordinary had rendered a decree against the administrator on 3rd February, 1818.    To this replication defendant demurred, and the court sustained the demurrer because the replication contained no averment that any default occurring prior to the discharge of defendant had been fixed upon the administrator.    In delivering the opinion of the court, O'Neall, J., who had also delivered the opinion in the previous case of *Simkins* v. *Cobb*, upon the authority of that case, states the rule to be that where letters of administration are revoked, and administration *de bonis non* is committed to the same person, "and the account of the first administration is legally made up, and *no other liability under his first administration is afterwards established by the decree of a court of competent jurisdiction, as existing before the revocation of the letters of administration*, then * * * the law would transfer the funds in his hands on his first administration, to his administration *de bonis non*, and the sureties of his first administration would be discharged."

In *Joyner* v. *Cooper* (2 Bail., 199), one McMish, having been substituted as committee of a lunatic, received from his predecessor his own bond as part of the assets of the lunatic's estate.    In an action upon the bond of McMish as committee, it was held that he and his sureties were liable for the amount of his own individual bond as cash in his hands belonging to the lunatic's estate, upon the well settled principle "that where one owes a debt to a trust and afterwards assumes the management of the trust, the amount of his debt shall be considered as so much cash in his hands."

In *Schnell* v. *Schroder* (Bail. Eq., 328), the defendant Schroder administered on the estate of one Boyer, and entered into bond with plaintiff as his surety.    Subsequently one of the distributees of Boyer having died intestate, Schroder also administered on her estate, and also became guardian of her only child. This bill was filed by the plaintiff, Schnell, to enjoin an action at law brought against him as surety on the bond of Schroder as administrator of Boyer, and it was held, amongst other things, that the liability of Schroder as administrator of Boyer to the estate

of the deceased distributee, of whom he had become administrator, had been transferred to his bond as such, and having become guardian of the sole distributee of his second intestate, such liability was again transferred to his bond as guardian, under the general rule above stated. The report of this case shows that the liability of Schroder as administrator of Boyer to his distributees had been ascertained by decrees of the Court of Equity, prior to the filing of plaintiff's bill.

The case of *Johnson* v. *Johnson* (2 Hill. Ch., 277), seems to hold that where an executor afterwards becomes guardian of one of the parties interested in the estate, he must, under the rule, be held liable in the latter capacity, although the amount of his liability as executor had not been fixed or ascertained; though the point as to the necessity for a previous ascertainment of the amount of such liability does not appear to have been discussed or considered.

In *Field* v. *Pelot* (McMull. Eq., 369), the question whether it is necessary that the amount of the liability should be previously ascertained before the rule of payment by operation of law can be applied, does not seem to have been decided, as it was not really necessary to a decision of that case; but the several members of the court, in delivering their separate opinions, do intimate their opinions upon that question—two of them, Harper and Duncan, CC., seeming to think that a previous ascertainment of the amount is necessary, while Johnson and Johnston, CC., appear to think otherwise, though it seems to us that the authorities cited to sustain the latter view do not support it.

In *O'Neall, Guardian,* v. *Herbert* (McMull. Eq., 495, reported also in Dud. Eq., 30), it appeared that J. W. Sibley and one Murray had administered on the estate of Mrs. McHardy in which the plaintiff's wards were interested, and each of them came into possession of a part of the funds belonging to said estate. Subsequently Sibley was appointed guardian of those wards, and upon his death, the plaintiff was appointed in his place. The bill was filed against the sureties of Sibley on his guardianship bond to account for his guardianship. On this accounting it was sought to charge the sureties on the guardianship bond of Sibley, not only with so much of the funds of the estate of McHardy as were

actually received by him, to which no objection appears to have been taken, but also with the amount received by his co-administrator, Murray, upon the ground that he is to be regarded as surety of Murray on their administration bond, and thus liable for the balance in Murray's hands, and that this being a debt due by him, became payable to himself as soon as he was appointed, which must, under the rule above stated, be regarded as paid by operation of law, and treated as cash in his hands as guardian, for which the sureties on his guardianship bond were liable. The court, however, held otherwise, saying: "To constitute that debt to himself which would bring this case within the principle of the cases relied on [*Simkins* v. *Cobb*, &c.], it is necessary that there should have been a breach of the condition of the bond ; it is necessary that Murray should have been called to account and a decree obtained against him. If that had been done, and, on his default, a judgment had been obtained against Sibley on the administration bond, this would have constituted such a debt to himself, on his being appointed guardian, as he was bound to pay."

In *Enicks* v. *Powell* (2 Strob. Eq., 196), where letters of administration had been revoked, and letters *de bonis non* granted to the same person, it was held that the sureties to the first bond were discharged from liability for the balance *afterwards ascertained* to have been in the hands of the administrator at the time the first letters were revoked, upon the ground that such balance being a debt due by the administrator to himself as administrator *de bonis non* was to be regarded as paid by operation of law, under the rule.

In *Griffin* v. *Bonham* (9 Rich. Eq., 71), it was held that where an executor was indebted to his intestate on notes, the amounts thereof, *as they matured*, were to be regarded as cash in the hands of the executor, upon which he would be entitled to commissions, as for so much money then received.

In *Clowney* v. *Cathcart* (2 S. C., 395), the lands of an intestate were sold under an order of the court and bid off by one of the administrators, who gave his bond to the commissioner in equity, secured by personal security, as well as a mortgage of the premises. Subsequently this bond and mortgage were by order

of court, assigned to the administrators to be applied by them in due course of administration, and the acting administrator, who was the obligor in the bond, afterwards assigned the same, together with the mortgage, to a creditor of the intestate in satisfaction of his claim. Held, that the bond and mortgage had not been extinguished by the transfer to the obligor on the same, because the assignment to him was in a different right from that of his obligation to pay, and unless there was some act expressive of an intention to treat them as extinguished, they will remain valid securities for the benefit of those in whose right they were assigned, and may be enforced for their protection. In this case the court takes occasion to explain and limit the broad and general expressions used in *Griffin* v. *Bonham* and *Schnell* v. *Schroder*, *supra*, and seems to indicate that the rule is that the creditors and distributees, in such a case, have the election, either to treat the bond as paid by operation of law and hold the administrator and his sureties on the administration bond liable for the same, as so much cash in the hands of the administrator, or insist upon the security afforded by the bond and mortgage of the administrator.

In *Jacobs* v. *Woodside* (6 S. C., 490), the action was on a note executed by one Charles with defendant Woodside and others as his sureties to E. O. Jacobs as executor of Wm. Jacobs. Upon the death of the executor, Charles was appointed administrator with the will annexed of Wm. Jacobs, and held that office for eleven years, when his letters of administration were revoked, and administration *de bonis non* committed to the plaintiff, and the note turned over to him. Held, that when Charles, the principal maker of the note, became administrator, he united in himself the character of both debtor and creditor, and, under the rule, the amount then due must be regarded as cash in his hands, and the note paid by operation of law. In delivering the opinion of the court, Moses, C. J., distinguishes this case from the previous case of *Clowney* v. *Cathcart*, by the fact that in this case it did not appear that Charles, while he was administrator, had transferred the note to a creditor of the estate, or that either he, or the parties interested in the estate, had done any act recognizing the note as an existing demand, or appropriating it to the debts of the

testator. But he takes no notice of the other point, plainly indicated in *Clowney* v. *Cathcart*, as to the right of election on the part of creditors and distributees or legatees, to regard the debt as paid by operation of law, or to pursue the sureties on the note. And as an administrator is understood to represent both creditors and distributees in the collection of the assets of the intestate, it would seem that the bringing of this action on the note should have been regarded as an election by the creditors and distributees, or rather legatees in this case, through their representative, to insist that the note was still a subsisting demand in favor of the estate.

In *Charles* v. *Jacobs* (9 S. C., 295) the application was to revive a judgment which was resisted upon the ground that the judgment had been paid by operation of law, because of the union of debtor and creditor in the person of the judgment debtor. It seems that Wm. Jacobs recovered the judgment in question against E. O. Jacobs, and afterwards died, leaving a will of which E. O. Jacobs became the qualified executor. Soon after E. O. Jacobs died and R. H. Jacobs became administrator *de bonis non*, with the will annexed of Wm. Jacobs, and as such transferred the judgment to the plaintiff in part payment of a legacy to him under the will of Wm. Jacobs. Held, that while, as a general rule, a judgment debtor becoming the personal representative of the judgment creditor, the amount due on the judgment will be regarded as cash in his hands, as such personal representative, and the judgment thereby extinguished; yet this rule is subject to many exceptions, and where, as in this case, the executor did not treat the judgment as paid, but died leaving it open, and the administrator *de bonis non* transferred it to a legatee in part payment of his legacy, the rule would not apply.

In this case the former Chief Justice, Willard, reviews the cases upon the subject, or rather some of them, and deduces from them the following rules: "That where a debtor becomes the executor or administrator of his creditor, the debt is presumed to be paid from the time of its maturity, and the executor or administrator is chargeable with the amount as realized assets, and when there is an official bond, the sureties are likewise responsible. That parties interested in the administration, such as creditors

and distributees, not having assented to such extinguishment, are not bound by such rule of presumption, but may elect to treat the debt as unpaid, if not actually paid, so as to reach any securities by way of mortgage, pledge, or lien taken by the creditor for its payment. So the executor or administrator may prevent the extinguishment of the original debt by treating and dealing with it as an outstanding obligation, as by transferring it to creditors of the estate as assets of the estate; but that such right cannot be exercised as against sureties to the obligation of the debtor, who are discharged if their principal, uniting in himself the character of payee and payer, thus deals with their obligation. That if the executor or administrator actually treats the debt as paid and accounts for it as such, it becomes legally extinguished as to such executor or administrator and those claiming under him, and cannot be revived by any act of the executor or administrator, such as transferring it in payment of the debts of the estate; and if payment is accepted by the distributees on such account, they too are precluded from setting up the debt."

Again he says: "There is some uncertainty in the language of the cases as to whether the original debt of the administrator may be treated as so far existing, after the debtor has become administrator of his creditor and such administration has terminated, that an action may be brought upon it by parties interested in the estate for other purposes than upholding a security given for such debt"—but he adds—"this question is of no great importance as regards the administrator himself, for his estate can be pursued without resorting to such obligation as the foundation of the proceeding, nor can it be made available as against personal securities for the debt as we have seen. But the cases fully support the idea that if any mortgage, lien, or collateral security is held for the debt, it may be pursued and made available in behalf of those interested in the estate." What is the rule where the administrator is jointly indebted to his intestate, is not stated, but is expressly passed over as undetermined.

In *Coleman* v. *Smith* (14 S. C., 511), the action was on the guardianship bond of Smith as guardian of plaintiffs. It appeared that the wards were entitled to an interest in the estate of Margaret Farr, and that Smith and one Brown were the administra-

tors of her estate. It became necessary that an account of their administration should be taken, which resulted in showing a considerable balance in the hands of Smith as administrator, and a smaller amount in the hands of Brown. There was no dispute that the balance in the hands of Smith as administrator became cash in his hands as guardian, upon his appointment as such, for which the sureties on his guardianship bond were liable; but it was contended that the balance in the hands of his co-administrator, Brown, should also be regarded as cash in his hands as guardian, upon the principle that such balance was a debt due by Smith to himself as guardian, and should therefore be regarded as paid by operation of law, and hence was cash in his hands as guardian, for which the sureties on his guardianship bond were liable. But the court ruled otherwise, upon the authority of *O'Neall v. Herbert, supra*, holding the rule to be that an administrator was not liable for the acts or defaults of his co-administrator, except as surety, where they sign a joint bond, and that such liability did not attach until default of the principal was ascertained.

In *Murray* v. *Witte* (16 S. C., 504), a purchaser of lands at a sale for partition gave her bonds to the commissioner in equity, which were afterwards turned over to her as guardian of two of the parties interested in the estate. As the instalments on these bonds became payable, she charged herself therewith in her returns as guardian. When the wards attained their majority, she settled with them by giving to each of them her own bond for the balance due by her as guardian, which bonds were afterwards reduced to judgment, and her land bought at the partition sale was sold by the sheriff under such judgments. Upwards of twenty years after the settlement with their guardian, these wards, who had long since attained full age, brought this action against the persons in possession of the lands under the sheriff's sale, to foreclose the statutory lien arising under the act of 1791, and the main question in the case was, whether the bonds given by the guardian at the sale for partition had been extinguished. This question was elaborately discussed by the present Chief Justice, in which the rules laid down in *Charles* v. *Jacobs, supra*, were recognized, and the conclusion was reached that, under all the circumstances, the bond must be regarded as extinguished.

In *Donnan* v. *Watts* (22 S. C., 430), it appeared that Sophia Langston became the purchaser of sundry articles at a sale of the personal estate of John M. Langston, and to secure the same gave her note with two sureties to the administrator. The administrator having died without fully administering the estate, letters of administration *de bonis non* were granted to Sophia Langston, who thus became possessed of her own note. Upon the final settlement of the estate of John M. Langston in the Probate Court, a decree was rendered against Sophia as administratrix *de bonis non* for a large amount, in which was included the amount of her own note, which was charged as cash in her hands. This action was brought by one of the sureties on Sophia's administration bond, to compel the sureties on her note to pay the same. Held, on the authority of *Jacobs* v. *Woodside*, *supra*, that the action could not be maintained.

In *Finch* v. *Finch* (28 S. C., 164), an executor bought property at his own sale, made in October, 1862, upon a credit of twelve months, and claimed to have invested the amount due at maturity in Confederate bonds. The court, while recognizing the general rule growing out of the union of the character of debtor and creditor in the same person, declined to apply it in this case for two reasons : 1st. Because the executor never was a debtor to himself, the law requiring him to give bond to the judge of probate to account for the purchase money of such property. 2nd. Because the transaction took place during the war between the States, when the only currency in use was Confederate treasury notes, which not being money, the executor could not be regarded as having paid himself the amount of his purchases in something which was not money.

In *Burnside* v. *Robertson* (28 S. C., 585), the action was brought by the judge of probate upon an administration bond, against an executor of one of the sureties on that bond. It appeared that the administrator was appointed in January, 1868, and shortly afterwards became the guardian of three of the distributees, and in December, 1868, a statement was made in the Court of Probate by the administrator of the estate in his hands, by which it appeared that, after reserving a specified sum to pay certain claims supposed to be outstanding, there was a consider-

able balance in his hands subject to distribution. This statement was, however, left open, without any formal decree, on account of uncollected assets of the estate, reserved to meet contested claims against the estate. In 1886, after the wards had attained their majority, upon the petition of the distributees for a final settlement, a decree was rendered against the administrator for a large amount. One of the points made by the defendant was, that when the administrator became guardian, the amount in his hands due his wards was paid by him by operation of law, and hence to that extent the administration bond was discharged. But the court held otherwise, for the reason that it had never been ascertained during the existence of the guardianship that the administrator was indebted to himself as guardian in any amount, and hence the relation of debtor and creditor had never been united in his person; for when the amount was ascertained in 1886, the debt was due and payable, not to the guardian, but to his former wards, as they had then attained full age, and the guardian no longer had any right to receive the same.

From this review of our cases, it appears that while conflicting expressions have been used in some of the cases as to whether the relation of debtor and creditor can properly be said to be united in the same person, where an administrator is subsequently appointed guardian of one of the distributees, or where his letters have been revoked and administration *de bonis non* is committed to the same person before the balance in his hands as administrator has been ascertained, yet the point has never really been *decided* except in the case last cited. The view there taken seems to us more conformable to reason, and should, therefore, be adhered to. If whatever balance there may be in the hands of an administrator, when his letters are revoked and administration *de bonis non* committed to him, at once becomes a debt due by him as administrator to himself as administrator *de bonis non*, then it would become his duty at once to charge himself in his accounts as administrator *de bonis non* with the amount of such balance as so much cash in his hands; but this would, manifestly, be impracticable until the amount of such balance had been ascertained. So, if an administrator becomes guardian of one of the distributees, it would be his duty at once to charge himself with

whatever amount he, as administrator, may owe to himself as guardian; but this certainly could not be done until such amount had been ascertained.

It may be, that where an administrator has, by his last return, admitted a certain balance in his hands, such balance would constitute a debt due to himself as administrator *de bonis non*, and hence chargeable as cash in his hands in the latter capacity, thus, to that extent, relieving his administration bond. and transferring the same to his bond as administrator *de bonis non;* but if it should afterwards appear that the true balance due by the administrator exceeded that admitted by his last return, we do not see how such excess could be regarded as a debt due by the administrator to himself as administrator *de bonis non*, until the amount of such excess had been ascertained; and if it is not ascertained during his administration *de bonis non*, it never could be regarded as a debt to himself, but must be regarded as a debt to him who is administering the estate at the time the amount of such excess is ascertained.

So, where an administrator becomes guardian of one of the distributees, before he has fully administered the estate of his intestate, we do not see how he can be said to be indebted to himself in any part of any balance that he may, by any of his returns, admit to be due by him as administrator, before the debts of the intestate have been paid, for it may be that the whole of such balance may be exhausted in the payments of such debts. As is well said by the Chief Justice in *Burnside* v. *Robertson*, *supra:* "Now, when does an administrator become indebted to the distributees of the estate, or to the guardian of the minors, in such way as it may be said that the relation of debtor and creditor exists as to any precise sum? It would seem not before the estate was in condition, at least, to ascertain the amount due each by the debts and expenses having been paid and all assets collected, and residuum of the estate in condition for distribution."

Where, however, a debtor assumes the administration of his creditor's estate, a clear case of the union of debtor and creditor in the same person is presented, and the amount of such debt becomes chargeable to the executor or administrator, as the case may be, in his capacity as such, and by reason of this change in

the form of the liability of the principal debtor, his sureties on
the note, or other evidence of the debt, are discharged; but if
the debt is secured by a mortgage or other lien, such lien is not
discharged.

Under these principles, which we regard as settled, it seems to
us that the first question presented by the grounds of appeal must
be answered in the affirmative, and that the Circuit Judge erred
in holding that Pettus W. Chick, or rather his estate, was dis-
charged from any liability as surety on the bond of G. M. Chap-
lin, as administrator of J. S. Chaplin, when letters of administra-
tion *de bonis non* on that estate were granted to his co-surety, R.
S. Chick. There never was any account taken of the adminis-
tration of G. M. Chaplin until after the administration *de bonis
non* of R. S. Chick had terminated, and hence it was never ascer-
tained that G. M. Chaplin, as administrator, was indebted to R.
S. Chick, as administrator *de bonis non*, in any amount. It is
true, that it is stated in the master's report that G. M. Chaplin
made a return as administrator in September, 1864, and that
another return was made for him in September, 1865; but what
balance was admitted to be due by him on such returns, if any,
does not appear, and it is quite clear that he died before fully
administering the estate, and that no final accounting was ever
had, ascertaining whether he was indebted to the estate of his
intestate, and if so, in what amount.

But in addition to this, it seems to us that the case of *O'Neall*
v. *Herbert, supra,* recognized and followed in the case of *Cole-
man* v. *Smith, supra,* and cited with approval in many other
cases, is absolutely conclusive of this case. In that case, although
Sibley was really one of the administrators, yet, as, upon well
settled principles, he could not be held chargeable *as such* with
the acts or defaults of his co-administrator, it was sought to charge
him as surety of Murray—they having executed a joint adminis-
tration bond—but the court held that as surety of Murray, he
was only liable for any breach of the condition of the administra-
tion bond that may have been committed by Murray, and, there-
fore, until such breach was established, he could not be regarded
as indebted to himself as guardian, using the language hereinbe-
fore quoted from that case.

Now, apply this principle to the case in hand. R. S. Chick, as surety of G. M. Chaplin, was only liable for any breach of the condition of the administration bond that may have been committed by G. M. Chaplin; and as no such breach was ever established while he occupied the position of administrator *de bonis non*, he never became, as surety, indebted to himself as administrator *de bonis non ;* and hence the relation of debtor and creditor never became united in the same person. As a test of this, suppose administration *de bonis non* had been committed to some third person; he, as administrator *de bonis non*, could not maintain an action against R. S. Chick, as surety on the administration bond of G. M. Chaplin, until some default or *devastavit* had been established against the administrator ( *Wilbur* v. *Hutto*, 25 S. C., 246); and, therefore, R. S. Chick as surety could not be properly said to be indebted to such administration *de bonis non* until such default or *devastavit* had been established. So, here, it cannot properly be said that R. S. Chick as surety ever became indebted to himself as administrator *de bonis non*, because no default or *devastavit* had ever been established against the administrator while he occupied that position. Inasmuch as it has been settled by the case of *Villard* v. *Robert* (1 Strob. Eq., 393), that an administrator *de bonis non* has the right to call the personal representative of his predecessor to account for the administration of such predecessor, it may be that R. S. Chick, as administrator *de bonis non*, as well as the sureties on his bond as such, might have been made liable for any loss incurred by the estate of the intestate, by reason of his failure to do so ; but that presents a different question from the one which we are called upon to determine, and need not, therefore, be considered.

Under this view, the second question presented by the grounds of appeal could not arise, and need not, therefore, be considered. If, as we have held, the estate of Pettus W. Chick is still liable, by reason of his suretyship on the bond of G. M. Chaplin, for any balance that may now be found to be due by said Chaplin as administrator, notwithstanding the appointment of his co surety, R. S. Chick, as administrator *de bonis non*, the question, whether such estate cannot be made liable for such balance by reason of his suretyship on the bond of R. S. Chick, as administrator *de*

*bonis non,* can scarcely arise, or at least becomes of no importance. But as the question is distinctly raised by one of the grounds of appeal, we will not decline to consider it. Assuming, then, for the purpose of this discussion only, that we are in error in the view which we have taken of the first question, we do not see how the estate of Pettus W. Chick can escape liability. If, as the assumption requires us to suppose, the balance now ascertained to have been due by G. M. Chaplin, as administrator, must be regarded as paid by operation of law, when his surety, R. S. Chick, became administrator *de bonis non,* then clearly such balance constituted a part of the assets of the intestate which went into the hands of R. S. Chick, as administrator *de bonis non,* and must be accounted for by him as such administrator; and if he failed to do so, then certainly his surety, Pettus W. Chick, would be liable for such default.

It was stated at the bar, however, in the progress of the argument, as we understood it, that the appellants had precluded themselves from making this claim by the agreement of counsel to adopt the accounts as stated by Master Douthit in the Greenville case, here nbefore referred to, in which that officer, in stating the account of R. S. Chick, as administrator *de bonis non,* does not charge him with the balance found due by G. M. Chaplin, as so much cash in hand, as would have been the proper course, under the assumption that the same was paid by operation of law. How this may be, we have no means of knowing, as there is no copy of the agreement of counsel referred to in the "Case," and we know nothing of it, except what is stated in the master's report in this case. But, as we have said, this is a question of no practical importance in this case, and, therefore, it need not be considered further.

As to the third question in reference to scaling the amounts due on the notes referred to, we are inclined to agree with the Circuit Judge in the view which he has taken, with a slight modification hereinafter stated. The master makes no finding of fact in reference to this matter, but dismisses the subject with the single remark, that "no reason is suggested for scaling the choses received by G. M. Chaplin at or before the death of his intestate," but the Circuit Judge finds as matter of fact that these notes were·

collected by G. M. Chaplin in Confederate currency, and as matter of law, that the amounts due thereon should be scaled, as of the 1st of January, 1863. Adopting this finding of fact, under the rule, as it cannot be said that there was no evidence to sustain it, then we think there was no error in the conclusion, that the amounts due on the notes should be scaled. While it is true that there is no evidence as to the dates of these notes, and they may have been executed before the war, yet, if the exigencies of the estate required that they should be collected, as seems to have been the fact, as the administrator appears to have been sued, we think the administrator would have been justified in collecting them in Confederate States treasury notes—the only currency then in circulation. *Koon* v. *Munro*, 11 S. C., 139. But, in the absence of any evidence as to when they were actually collected, we think it fair to assume that they were collected at maturity, and scaled as of that date, viz., Chaplin's own note as of 1st January, 1863, and the lot of notes, amounting to $1,918.45, as of 1st January, 1862; and with this modification, we concur in the conclusion reached by the Circuit Judge as to this matter.

We also agree with the Circuit Judge as to the mode of computing the interest, as his view was clearly according to law, and was not affected by the agreement of counsel.

The judgment of this court is, that the judgment of the Circuit Court be reversed, in so far as it conflicts with the views herein announced, and that in all other respects it be affirmed, and that the case be remanded to that court for such further proceedings as may be necessary to carry out the views herein announced.

MR. JUSTICE McGOWAN concurred.

MR. CHIEF JUSTICE SIMPSON. I concur in the main question herein, because I do not think that the characters of debtor and creditor ever united in the person of R. S. Chick, so as to give rise to the principle, that the debt was extinguished by operation of law. I concur also in the remainder of this opinion for the reasons therein given.

The respondents filed a petition for the rehearing of this case,

alleging that while the court found that the administrator had received notes to the amount of $1,918.45 for collection, due January 1, 1862, and were collected by him as administrator, they held him responsible for the value of these notes in Confederate money as of the date of their maturity, which was more than eleven months before he obtained his letters of administration, or received the notes, still uncollected, into his possession.

December 9, 1889.  The order of the court was delivered

PER CURIAM.  We have carefully examined this petition, and finding that no material fact or principle of law has been overlooked, the petition is dismissed.